UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
PATRICK ENRIGHT, HENRY DIAMOND,                             :
JAMES LYNCH, JOHN GORDON, JAMES                             :
PATTERSON, EMANUEL PYROS and MIKE                           :
ZEMSKI,                                                     :
                                                            :
                                    Plaintiffs,             :
                                                            :
                 -against-                                  :
                                                            :
NEW YORK CITY DISTRICT COUNCIL OF                           :
CARPENTERS WELFARE FUND, THE BOARD                          :        12 Civ. 4181 (JPO)
OF TRUSTEES OF THE NEW YORK CITY                            :
DISTRICT COUNCIL OF CARPENTERS                              :        OPINION AND ORDER
WELFARE FUND, JOSEPH EPSTEIN, as                            :
EXECUTIVE DIRECTOR OF THE NEW YORK                          :
CITY DISTRICT COUNCIL OF CARPENTERS                         :
WELFARE FUND,                                               :
                                                            :
                                    Defendants,             :
                 -and-                                      :
                                                            :
THE DISTRICT COUNCIL OF NEW YORK                            :
CITY AND VICINITY OF THE UNITED                             :
BROTHERHOOD OF CARPENTERS AND                               :
JOINDERS OF AMERICA,                                        :
                                                            :
                                    Defendant-              :
                                    Intervenor.             :
                                                            :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       This case concerns the legality of an arrangement whereby dues were paid to a union by

way of a welfare fund, as well as the permissibility of changes to that fund that adversely

affected retiree participants.  Patrick Enright, Henry Diamond, James Lynch, John Gordon,

James Patterson, Emanual Pyros, and Mike Zemski ("Plaintiffs") brought this action against New

York City District Council of Carpenters Welfare Fund ("the Welfare Fund"), the Board of

Trustees of the New York Trustees of the New York City District Council of Carpenters Welfare Fund ("the Trustees"), Joseph Epstein, as Executive Director of the Fund (together, "Defendants") as well as the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joinders of America ("the District Council" or "the Defendant-Intervenor"), for violations of the Labor Management Relations Act of 1947, as amended ("LMRA"), 29 U.S.C. 185, *et seq.*, and the Employee Retirement Income Securities Act of 1974 ("ERISA"), 29 U.S.C. 1001, *et seq.*

Before this Court are cross-motions for summary judgment filed by Plaintiffs, Defendants, and Defendant-Intervenor.  For the reasons that follow, those motions are granted in part and denied in part.

## I.      Background

### A.      Factual Background

The majority of facts relevant to this action are not in dispute.  Unless otherwise noted, the following facts are taken from the parties' Stipulation of Uncontested Facts.  (Dkt. Nos. 23-25 ("Stip.").)

#### 1.      Parties

Plaintiffs Patrick Enright, Henry Diamond, James Lynch, and John Gordon are retired participants in the Welfare Fund and members of a local union within the District Council, while Plaintiff James Patterson is the former Deputy Director of the Welfare Fund and is also a Welfare Fund participant (together, "the Retiree Plaintiffs").

Plaintiffs Emanual Pyros and Mike Zemski are active participants in the Welfare Fund.

The Welfare Fund is a multiemployer, employee welfare benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1), and a trust fund within the meaning of LMRA Section 302(c)(5), 29 U.S.C. § 186(c)(5).

The Welfare Fund is administered by the Trustees, half of whom are appointed by the District Council ("the Union Trustees") and half of whom are appointed by employer associations that have collective bargaining agreements ("CBAs") with the District Council requiring contributions to the Fund ("the Employer Trustees").  The Trustees are fiduciaries of the Fund, as defined by ERISA Section 21(A), 29 U.S.C. § 1002(A)(1).

Joseph Epstein served as the Fund's Executive Director from July 2011 through July 2012.

The District Council, a labor organization within the meaning of Section 301 of the LMRA, is composed of various local unions whose members are employed as, *inter alia*, carpenters in New York City and its surroundings.

### 2.      The Welfare Fund and its Trustees

The Welfare Fund provides, *inter alia*, medical, disability, and vacation benefits to its participants, including both active participants working under CBAs as well as certain retired participants.  The Welfare Fund was established pursuant to a trust agreement originally adopted by the District Council and employer associations in the construction industry in 1950.  As of June 30, 2011, the Welfare Fund had approximately 25,371 participants.  Employers contribute to the Welfare Fund on behalf of their active employees.

Prior to October 2006, vacation benefits were not paid into the Welfare Fund.  Instead, a separate fund held vacation benefits for employees of contributing employers ("the Vacation Fund").  In October 2006, the Vacation Fund merged with the Welfare Fund.  However, the

Welfare Fund continues to hold the assets related to employees' vacation benefits in a separate investment vehicle.  (Dkt. No. 35 ("Jacobs Decl."), at ¶ 8.)

For a period in 1992 and now again, since June 2012, the Welfare Fund has been funded in part by retiree premiums.  At all other times, retirees have not been required to contribute premiums.

As explained *supra*, the Welfare Fund is administered by its Trustees, half of whom are Union Trustees and half of whom are Employer Trustees.  The Union Trustees together receive one vote, and the Employer Trustees receive one vote.  Any action by the Trustees requires a vote of two to zero.  An arbitrator is appointed in the event of a deadlock.

### 3.    Administration of Vacation Benefits and Working Dues

Pursuant to Section 14 of the District Council's Bylaws, union members must pay to the District Council so-called working dues in the amount of 1% of the participants' total package rate as reflected in the current CBA for each hour worked, $0.60 per hour for each hour worked, and an additional $500 per year ("the working dues").  Prior to June 2012, the working dues were deducted from union members' vacation benefits in accordance with executed authorization cards and were then forwarded by the Welfare Fund to the District Council ("the Blue Card system").  The authorization cards executed by union members provided:

> Dear Fund Administrator, You are hereby authorized and directed to deduct from my vacation pay when distributed to me, such amounts as designated, or as hereafter designated, by the District Council of Carpenters and my Local Union, if it is affiliated with the [District Council], and remit such sums to the District Council of Carpenters and/or my Local Union.   The said amount so deducted represents a working assessment which I hereby direct to be paid to said District Council of Local Union, as the case may be to the extent permissible under applicable law . . . .

Thus, prior to June 2012, vacation benefits payable to participants were the sum of contributions made by employers less the amount participants authorized and directed to be paid to the District Council for working dues.  Until last year, the Welfare Fund was never compensated by the District Council for its role in the Blue Card system.  In June 2012, after "emerg[ing] from many decades of control by organized crime" (D.C. Mem. at 1), the Trustees retained an independent certified public accounting firm, Schultheis & Penettieri, LP ("S&P"), to determine the appropriate cost allocation for the function performed by the Welfare Fund in connection with the Blue Card system.  (Jacobs Decl. at ¶ 17.)  The firm determined that the administrative costs of the program were $1,363,295.  (*Id*. at ¶ 18.)  On February 14, 2013, the District Council reimbursed the Welfare Fund $1,760,196 for the costs of administering the dues deduction program, plus interest.  (*Id*. at ¶ 19.)

### 4.    The Trust Agreements

The Welfare Fund was established and is maintained pursuant to a Trust Agreement.  The parties to the relevant Trust Agreements were the Trustees, the District Council, and various employer associations.  There have been two Trust Agreements in effect since 1982: the Amended Agreement and Declaration of Trust, effective as of May 20, 1982 ("the 1982 Trust Agreement") and the Amended Agreement and Declaration of Trust, effective as of July 1, 2004 ("the 2004 Trust Agreement").  The 2004 Trust Agreement remains in effect today.

At issue in the instant action are the differences between Section 4(e) in the 1982 Trust Agreement and Section 2(e) of the 2004 Trust Agreement.  Section 4(e) of the 1982 Trust Agreement provides:

> The Trustees are authorized to grant (1) all Fund benefits to the supervisory, auditing, and office employees of the [District Council] and its related Funds, (2) all Fund benefits, except those pertaining to accidental death & dismemberment, and disability, to

> retired employees, with no contributions being paid on their behalf after retirement, and (3) all Fund benefits to the employees of the [District Council] and to the employees of the Unions belonging to said District Council provided that annual contributions to the Fund are paid at a uniform rate or rate per person as shall be determined, in their discretion, by the Trustees.  This amendment shall be retroactive to May 1, 1962.

By contrast, Section 2(e) of the 2004 Trust Agreement provides:

> The Trustees are authorized to grant (1) all Fund benefits to . . . employees of the [Funds], (2) all Fund benefits to former Participants and Beneficiaries, and (3) all Fund benefits to the employees of the Union, the Affiliated Locals, the Labor-Management Corporation, employer associations . . . and the employer members of such associations, provided that annual Contributions are paid at a uniform amount or rate per person as shall be determined, in their discretion, by the Trustees.  In the event that the Trustees grant any Fund benefits to former Participants and Beneficiaries, the Trustees may require such former Participants and Beneficiaries to pay a portion of the annual cost of Plan coverage to receive such benefits.

No written notice of the 2004 amendment was provided to the Welfare Fund participants.

The CBAs provide no promises regarding the level of benefits to be received by current or past employees.  The CBAs do state, however, that "[e]ach Employer shall be bound by all the terms and conditions of the Agreements and Declarations of Trust, creating the Welfare and Pension Funds . . . ."

### 5.    The Summary Plan Descriptions

The Summary Plan Descriptions ("SPDs") describe the benefits available under the Welfare Fund, and inform participants of their rights and obligations, eligibility rules, when benefits may be denied, and procedures to file for benefits and to appeal claim denials. Participants are informed of amendments to an SPD by a Summary of Material Modification ("SMM").

The SPD in effect in 1982 was issued on July 1, 1978 ("the 1978 SPD").  In that 1978 SPD, the Trustees "reserve[d] the right to amend, modify or discontinue all or part of this Plan whenever, in their judgment, conditions so warrant."  In that same document, the Trustees "reserve[d] the right to change or discontinue (1) the types and amounts of benefits under this plan and (2) the eligibility rules providing extended or accumulated eligibility even if the extended eligibility has already been accumulated."

### 6.       The Welfare Fund's Recent Troubles

In recent years, the Welfare Fund's consultant has advised the Trustees that the Welfare Fund's financial position is deteriorating, and that its costs have regularly exceeded its income. In Fall 2011, the Trustees distributed a newsletter to Welfare Fund participants advising them of the Welfare Fund's deteriorating financial condition and of cost-saving measures being considered.  The newsletter stated in part:

> Q. Why is the Fund considering cost-control measures now?
> A. The Fund has not been immune to the economic problems plaguing our nation.  Over the past several years, the combination of fewer big construction projects and an increased presence of non-union contractors in our area had reduced the number of jobs for Carpenters.  The result: an increased unemployment rate, an overall reduction of man-hours worked by participants, and a decline in the Fund's contribution income.

According to the Arbitrator's deadlock award, *see infra*, the Welfare Fund has been experiencing negative trends since 2009.

### 7.       Deadlock and Arbitration

In light of the Welfare Fund's precarious financial condition, the Trustees agreed that the Welfare Fund needed to take steps to preserve the Fund's solvency.  The Union and Employer Trustees could not agree, however, on what those steps should be taken to right the Welfare

Fund.  In 2011, the Trustees reached a deadlock over measures to reduce the Welfare Fund's costs.

In accordance with the Trust Agreement, the Trustees appointed Arbitrator Martin Scheinman to resolve the deadlock.  On January 31, 2012, Arbitrator Scheinman issued an Interim Award regarding the measures to be taken to right the Welfare Fund.  The Arbitrator's Interim Award directed the implementation of certain benefit modifications sufficient to reduce to Fund's expenses by $3.00 per hour by April 1, 2012.  With respect to retirees, the Arbitrator ordered approximately 15 benefit reductions, including adding an in-network deductible and increasing the out-of-network deductible.  The only reduction challenged by Retiree Plaintiffs is a requirement of a monthly premium equal to 10 percent of the benefit cost.  The Trustees extended the implementation date of the Arbitrator's order to June 1, 2012 to allow the Welfare Fund adequate time to address certain administrative issues that arose as a result of the benefit changes.

At the end of March 2012, the Welfare Fund mailed SMMs describing the benefit changes to all participants, including retirees, that would take place as of June 1, 2012.

To date, over 500 retired participants of the Fund have not paid the required monthly premiums, as a result of which their coverage has been terminated.

## B.    Procedural Background

Plaintiffs commenced this action on May 25, 2012.  (Dkt. No. 1 ("Compl.").)  The Complaint contains claims: (1) for breach of fiduciary and violation of LMRA Section 186 ("Claim One"); (2) for breach of fiduciary duty under ERISA Section 404 ("Claim Two"); (3) to enjoin practices in violation of the terms of Fund under ERISA Section 502(A)(3) ("Claim Three"); (4) to vacate and void the July 1, 2004 Trust Amendment ("Claim Four"); for structural

violation of LMRA Section 186 ("Claim Five"); for breach of fiduciary duty under LMRA Section 186 ("Claim Six"); for violation of ERISA's exclusive purpose rule, found in ERISA Section 403 ("Claim Seven"); and for engaging in transactions prohibited pursuant to ERISA Section 406 ("Claim Eight").  Claims One through Four ("the class claims") are brought on behalf of the Retiree Plaintiffs and all others similarly situated.  Claims Five through Eight ("the non-class claims") are brought on behalf of all Plaintiffs.

Defendants answered on November 11, 2012.  (Dkt. No. 7 ("Ans.").)  On December 21, 2012, the District Council moved to intervene as a defendant, pursuant to Rules 24(a) or 24(b).  (Dkt. No. 10.)  That motion was granted on January 18, 2013.  (Dkt. No. 15.)  The District Council answered on January 22, 2013.  (Dkt. No. 18 ("DC Ans.").)  On February 1, 2013, Plaintiffs moved for partial summary judgment on Claims One, Two, and Three.  (Dkt. No. 27 ("Pls.' Mem.").)  On March 8, 2013, Defendants cross-moved for summary judgment on Plaintiffs' Claims Five through Eight and the non-class portion of Claim Two (Dkt. No. 34 ("Defs.' Mem.")) and moved for summary judgment, and opposed Plaintiffs' motion for summary judgment, on Claims One, Two, and Three.  (Dkt. No. 39 ("Defs.' Opp'n.").)  That same day, the District Council cross-moved for summary judgment.  (Dkt. No. 43 ("DC Mem.").)  On April 12, 2013, Plaintiffs replied (Dkt. No. 47 ("Pls.' Rep.") and opposed Defendants' motions for summary judgment.  (Dkt. No. 49 ("Pls.' Opp'n.").)  Defendants replied on May 24, 2013.  (Dkt. Nos. 52 & 59.)  The District Council replied on that same day.  (Dkt. No. 56.)   Plaintiffs sur-replied to Defendants' class claims motion and to the non-class claims motions on June 21, 2013.  (Dkt. Nos. 65, 67.)

Oral argument on all of the motions was held on June 26, 2013.

## II.    Discussion

### A.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the evidence 'show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Pelosi v. Schwab Capital Markets, L.P.*, 630 F. Supp. 2d 357, 359 (S.D.N.Y. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (alteration in original)).  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 256).  The Supreme Court has stated that an issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The Court must view all evidence and facts "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citing *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 572 (2d Cir. 1993)).  To prevail on a claim for summary judgment, it must be shown that "no reasonable trier of fact could find in favor of the nonmoving party."  *Id.*; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587); *see also Anderson*, 477 U.S. at 249-50.

### B.    Plaintiff's Claims under the LMRA

Section 302 of the LMRA provides in relevant part:

(a) It shall be unlawful for any employer or association of employers . . . to pay, lend or deliver  . . . any money or other thing of value –

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer of employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer . . .

(b)(1) It shall be unlawful for any person to request, demand, receive or accept, or agree to receive or accept, any payment, loan or delivery of any money or thing of value prohibited by subsection (a) of this section. . . .

(c) The provisions of this section shall not be applicable . . . (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner; (5) with respect to money or other thing of value paid to a trust fund established by [the representatives of the employees], for the sole and exclusive benefit of the employees of such employer, and their families and dependents . . . *Provided*, That (A) such payments are held in trust for the purpose of paying . . . for the benefits of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees . . . .

29 U.S.C. § 186.

Critically, Section 302(e) grants jurisdiction to the federal courts only "to restrain violations of this section . . . ." *Id.*  In *Local 144 Nursing Home Pension Fund v. Demisay,* 508 U.S. 581 (1993), the Supreme Court defined the term "violations," thereby articulating boundaries of courts' jurisdiction under Section 302(e) of the LMRA.  First, the Court explained that violations of Section 302 occur "when the substantive restrictions in §§ 302(a) and (b) are disobeyed, which happens, not when funds are administered by the trust fund," but rather when

"[funds] are 'pa[id], len[t], or deliver[ed]' to the trust fund, §302(a), or when they are 'receive[d], or accept[ed]' by the trust fund, or 'request[ed] or demand[ed]' for the trust fund, §302(b)(1)." *Id.* at 588.  Second, the *Demisay* court drew a distinction between actions related to the purpose of a fund and actions related to a fund's operation:

> [T]he exception to violation set forth in paragraph (c)(5) relates, not to the purpose for which the trust fund is in fact used (an unrestricted fund that happens to be used "for the sole and exclusive benefit of the employees" does not qualify); but rather to the purpose for which the trust fund is "established," § 302(c)(5), and for which the payments are "held in trust," § 302(c)(5)(A). The trustees' failure to *comply* with these latter purposes may be a breach of their contractual or fiduciary obligations and may subject them to suit for such breach; but it is no violation of § 302.

*Id.* at 587-88.  In short, "§ 302(e) does not provide authority for a federal court to issue injunctions against a trust fund or its trustees requiring the trust funds to be administered in the manner described in § 302(c)(5). . . .  [R]ather, it allows federal courts to 'restrain violations' of § 302, which . . . occur when payments to a nonqualifying trust are made or received."    *Id.* at 587-590.

Shortly after *Demisay*, the Second Circuit squarely held that where a plaintiff "does not contest that [a] Benefit Fund was properly established under § 302(c)(5), but contends that it was subsequently operated in a manner inconsistent with § 302(c)(5)," a district court's jurisdiction is "preclude[d]" by *Demisay*.  *Devito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 n.3 (2d Cir. 1994).  Thus, a claim under the LMRA cannot be based on amendments to the trust.  *See Reade v. Allied Trades Council*, No. 04 Civ. 3542 (BSJ), 2005 WL 3038645, at *2 (S.D.N.Y. Oct. 7, 2005) ("Plaintiffs' argument that *Demisay* allows claims based on amendments to the trust documents after the initial establishment of the funds not only is without support, but also contradicts prior interpretations of *Demisay* in this Court."); *see also Lipton v. Consumers Union*

*of U.S., Inc.*, 37 F. Supp. 2d 241, 245 (S.D.N.Y. 1999) ("In other words, violations occur only

when money is paid into the trust; no violation occurs when money already in the trust is

invested or otherwise administered."); *Schneider v. Local 103 I.B.E.W. Health Plan*, 442 F.3d 1,

2 (1st Cir. 2006) (dismissing claims where plaintiff claimed fund assets were being used for an

incorrect purpose); *Ladzinski v. MEBA Pension Trust*, 951 F. Supp. 570, 573 (D. Md. 1997)

(plaintiff alleging miscalculation of his pension benefits lacked subject matter jurisdiction under

Section 302(e)).

   Plaintiffs bring three claims under the LMRA.  First, Retiree Plaintiffs allege in Claim

One that "[b]y modifying the plan . . . to require contributions from retirees . . . the defendants

have violated the express provisions of the 1982 Trust Agreement in violation of LMRA Section

302(c) . . . ."  (Compl. at ¶ 42.)  Next, Plaintiffs allege in Claim Five a so-called "structural

violation" of the LMRA:

> the use of Welfare Fund assets to pay dues to the District Council
> constitutes at the very least a structural violation of the LMRA as
> such monies are not being held in trust for the exclusive benefit of
> the employees (indeed they are for the sole benefit of the District
> Council and its affiliated local unions) and are not being held to
> pay medical or vacation benefits or any other benefits permitted by
> the LMRA.

(*Id*. at ¶ 58.)  Finally, Claim Six alleges:

> By using Welfare Fund assets to pay dues to the District Council
> the Welfare Fund fiduciaries . . . are not discharging their duties
> solely in the interest of the participants and beneficiaries and for
> the exclusive purpose of providing benefits to participants and
> their beneficiaries but are instead discharging a substantial portion
> of their duties in the interests of the District Council . . . in
> violation of Section 186(c) of the [LMRA], 29 U.S.C. 186(c).

(*Id*. at ¶ 60.)

All three claims relate to the "modif[ication]" of the Trust Agreement or the "use" of Trust assets to pay dues, rather than to the establishment of the Trust. Indeed, the Complaint concedes that "[t]he Fund was established pursuant to [the] LMRA . . . ." (Id. ¶ 10.) Because Claims One, Five, and Six relate not to the administration of the Trust and not its establishment, they do not concern "violations" of Section 302 as defined in *Demisay*. Accordingly, the Court lacks jurisdiction to adjudicate Plaintiffs' LMRA claims under Section 302(e).[1]

### C.   The Class Claims

#### 1.   Contractual Vesting Claim

In Claim Two, Retiree Plaintiffs allege that Defendants violated Sections 404(a) and 502(a)(1)(B) of ERISA by modifying the Welfare Plan to require contributions from retired employees.[2]

Retiree Plaintiffs point to one—and only one—ostensible affirmative promise of welfare benefits: in Section 4(e) of the 1984 Trust Agreement.[3] Retiree Plaintiffs argue that the 1984 Trust Agreement prohibited the Trustees from requiring retiree contributions in the form of

---

[1] Even if the Court were to have jurisdiction over Claim One, it would be dismissed, as Defendants did not violate the express provisions of the 1982 Trust Agreement by modifying the Welfare Plan to require contributions. Moreover, Plaintiffs has consented to the dismissal of Claims Five and Six, as is explained *infra*.

[2] Claim Two does not in fact mention Section 502(a)(1)(B), but it is clear from Retiree Plaintiffs' briefs that the gravamen of the claim—indeed of all the class claims—is that Defendants have unlawfully reduced benefits that are contractually vested under Section 502(a)(1)(B). (Pls.' Opp'n. at 10 n.8.) Claim Two also alleges a breach of fiduciary duty connected with the use of the Welfare Fund assets to pay dues to the District Council. This portion of Claim Two is a non-class claim, and therefore is discussed later in this Opinion.

[3] Retiree Plaintiffs do *not* contend, for example, that the SPDs – the employees' major source of information concerning their benefits, *see Layaou v. Xerox*, 238 F.3d 205, 209 (2d Cir. 2001) ("ERISA 'contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." (quoting *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir. 1990)) (alteration in *Layaou* ) – contained affirmative promises of lifetime benefits.

monthly premiums and/or co-payments.  In other words, they interpret the 1984 Trust Agreement as "vest[ing its participants with] non-contributory lifetime retiree health benefits."  (Pls.' Opp'n. at 7.)  This contention lacks merit.

"ERISA regulates pension plans far more extensively than welfare plans.  For example, welfare plans are expressly exempted from the Act's detailed minimum participation, vesting and benefit-accrual requirements . . . ."  *Moore v. Metro. Life Ins. Co.,* 856 F.2d 488, 491 (2d Cir. 1988); *see also Am. Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp.*, 116 F.3d 976, 979 (2d Cir. 1997) ("[R]etiree welfare benefits are generally not vested, and an employer can amend or terminate a plan providing such benefits at any time.")  Stated differently, the general rule is that "[n]othing in ERISA . . . forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan . . . ."  *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77 (2d Cir. 1996).  But there is an important exception to this rule: The termination of welfare benefits will rise to an impermissible denial of benefits claim where "the plan documents contain specific written language that is reasonably susceptible to interpretation as a promise to vest the benefits." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 60 (2d Cir. 2006) (internal quotation marks and citations omitted).  Thus, while ERISA does not prohibit trustees from amending welfare plans, if vested benefits have been specifically promised, "that promise will be enforced."  *Int'l Multifoods Corp.*, 116 F.3d at 980 (citing LMRA § 301(a), 29 U.S.C. § 185(a); 29 U.S.C. § 1132(a)(1)(B)).

"Whether an employee's benefits have vested under an ERISA welfare plan is a matter of contract interpretation."  *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 576 (2d Cir. 2006) (citation omitted); *see also US Airways, Inc. v. McCutchen*, 133 S.Ct. 1537, 1549

(2013) ("Courts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" (quoting *Firestone & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)).  Where the relevant plan documents are ambiguous, the Court may consider extrinsic evidence.  *Int'l Multifoods Corp.*, 116 F.3d at 981; *In re Chateaugay Corp.*, 891 F.2d 1034, 1038 (2d Cir. 1989); *cf. Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A*, 441 F. Supp. 2d 405, 431 (S.D.N.Y. 2006) ("The Plan and SPDs are clear and unambiguous, making extrinsic evidence (even if any existed) neither necessary nor admissible.").  "In this Circuit, to reach a trier of fact, an employee does not have to point to unambiguous language to support [a] claim.  It is enough [to] point to written language *capable of reasonably being interpreted* as creating a promise on the part of [the employer] to vest [the recipient's] . . . benefits." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 83 (2d Cir. 2001) (citations and internal quotation marks omitted) (alterations and emphasis in original). Nonetheless, the Second Circuit has repeatedly explained that it is *not* sufficient for a plaintiff to gesture towards "several statements that become ambiguous only after extensive linguistic contortion . . . ." *Joyce*, 171 F.3d at 134.  Nor may the "*absence*" of language in the relevant documents create the requisite ambiguity.  *Id*. (emphasis in original).  Rather, a plaintiff must point to "language [in the CBA] that *affirmatively operates* to create the promise of vesting." *Id*. at 135 (emphasis added); *see also id.* ("[A] commitment to vest 'is not to be inferred lightly' and [ ] it must be found in express language from the plan documents" (citing *Sprague v. General Motors Corp.,* 133 F.3d 388, 400 (6th Cir. 1998)).  In this context, the absence of evidence is indeed evidence of absence.

Section 4(e) of the 1982 Trust Agreement provides that "[t]he Trustees are *authorized* to grant . . . Fund benefits . . . to retired employees, with no contributions being paid on their behalf

after retirement."  "To authorize" means "to give authority or official power to; empower."

*Dictionary.com Unabridged*. Random House, Inc. (June 17, 2013).  Simply because one has the

authority to do something does not in any way imply that she must use the authority.  Nor does

Section 4(e), or any other section of the 1982 Trust Agreement, "require" or "mandate" that the

Trustees grant such benefits.  The 1982 Trust Agreement, then, does not affirmatively grant

retiree plaintiffs lifetime benefits without contribution.

In support of its reading of the 1982 Trust Agreement as providing guaranteed benefits,

Retiree Plaintiffs cite several cases, none of which is availing.  For example, Retiree Plaintiffs

rely on *Reese v. CNH Am. LLC*, 574 F.3d 315 (6th Cir. 2009), arguing that "the language of the

[1982 Trust Agreement] is almost identical" to the language in *Reese* that was held to disallow

contribution requirements.  (Pls.' Opp'n. at 12.)  In *Reese*, the Sixth Circuit held that benefits had

been promised to retired employees.  The relevant CBA provided

> that "[e]mployees who retire under the Case Corporation Pension
> Plan for Hourly Paid Employees after 7/1/94, or their surviving
> spouses eligible to receive a spouse's pension under the provisions
> of that Plan, shall be eligible for" health-care benefits, JA 1288,
> and added that "[n]o contributions are required for the Health Care
> Plans," JA 1291.

*Id*. at 322.  While it is true that the *Reese* court held that the CBA's "no contribution" language

constituted a promise, the language in the CBA in *Reese* is far from identical to the language of

the 1982 Trust Agreement.  In *Reese*, the CBA clearly stated that retirees "shall be eligible for"

benefits.  Indeed, this language was central to the Sixth Circuit's determination that benefits had

been promised.  *See id*. at 324 (explaining that the "[shall be eligible for"] language, when tied to

eligibility for a pension plan, prevents an employer from *terminating* the benefits" (emphasis in

original)).  Retiree Plaintiffs have pointed to no analogous language in the 1982 Trust

Agreement.

Similarly, in *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 483 n. 1 (6th Cir.

2009), the Sixth Circuit analyzed the following language in a CBA:

> Employees who retire on or after January 1, 1996 and who are
> eligible for and receiving a monthly pension under the 1993
> Pension Plan . . . whose full years of attained age and full years of
> attained continuous service . . . at the time of retirement equals 95
> or more points *will receive a full Company contribution towards
> the cost of [health-care] benefits* . . . .

*Id*. at 489-90 (emphasis and alterations in original).  The Sixth Circuit held that "the 'full

Company contribution' language suggests that the parties intended the employer to cover the full

cost of health-care benefits for those employees meeting the age and term-of-service

requirements."  *Id*. at 490.   Again, however, the CBA specifically indicated that the retired

employees "will receive" the benefits at issue.  And again, no such language exists in the 1982

Trust Agreement.

In short, Plaintiffs have cited no cases suggesting that the authorization to provide

benefits can reasonably be construed as a promise to provide those benefits.  *Cf. Devlin*, 274 F.3d

at 84-85 (genuine dispute of material fact as to whether benefits were promised where SPD

stated "retired employees, after completion of twenty years of full-time service and at least age

55 *will be insured*" and that life insurance benefits "will remain at [the annual salary level] *for

the remainder of their lives*" (emphases in original)).

Retiree Plaintiffs argue that the "authorizing" language logically implies a guarantee of

benefits.  They claim that Section 4(e) is meant to circumscribe the three groups of people to

which benefits can be granted, and that it is apparent from the language in Section 4(e) that all

benefits granted to retirees must be granted without contribution.   In fact, reading Section 4(e) in

its entirety, it is clear that Section 4(e)'s authorization to provide retirees benefits "with no

contributions being paid on their behalf after retirement" includes by implication authorization to

allow benefits with some contribution.  The "no contributions" language in Section 4(e) distinguishes the benefits the Trustees are authorized to provide retirees from those the Trustees are authorized to provide current employees, which may only be granted "*provided that* annual contributions to the Fund are paid at a uniform rate or rate per person as shall be determined, in their discretion, by the Trustees."  Thus, while employee benefits may not be distributed unless annual contributions are paid by employers, retirees may receive benefits even if no such contributions are made on their behalf.   In other words, the "without contribution" language in Section 4(e)(2) provides the Trustees with *more* discretion concerning the granting of benefits to retirees, not less.   Indeed, it would be illogical to read Section 4(e) as requiring that any benefits provided to retirees be made "without contribution" by the retired employees.  Under such an interpretation, the Trustees would have the right to suspend benefits to retirees entirely, but would not be permitted to impose a modest copayment on retired employees.[4]

Even if Retiree Plaintiffs were right, however, that the language in Section 4(e)(2) suggests that any benefits given to retired employees must be provided without contribution, this does not, in and of itself, rise to the level of an affirmative promise of benefits.  After all, it is indisputable that, even under Retiree Plaintiff's reading, Defendants have the authority to

---

[4] Moreover, by Retiree Plaintiffs' logic, the 1982 Trust Agreement authorizes the Trustees to grant "all Fund benefits" to each of the three categories of employees enumerated in Section 4(e), or else no benefits at all, as each category of benefits is similarly modified by the word "authorized."  But Section 4(b) clearly states that insurance benefits shall be subject to "provisions, limitations and conditions as the Trustees may, in their sole opinion, deem necessary or shall from time to time determine" and that "the Trustees are authorized to pay or provide for the payment of the above benefits, *in whole or in part* . . . ."  It therefore cannot be that Section 4(e) enumerates the minimum level of benefits available to each group.  Indeed, Section 4(b) appears to reserve the Trustees rights to reduce or change any benefits provided by the Welfare Fund.  *Accord Coriale v. Xerox Corp.*, 490 Fed. Appx. 387, 389 (2d Cir. 2012) ("[W]here the same plan document contains a reservation of rights and a lifetime guarantee, the document does not create a vested benefit." (citing *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 100 (2d Cir. 2001)).

eliminate retired employees' benefits in their entirety.  Instructive here is a leading case in this Circuit on contractual vesting, *International Multifoods Corp.*  There, the Second Circuit considered the legality of an employer's decision to begin demanding contribution for medical insurance premiums.  The relevant CBA stated, "A schedule of [medical] insurance coverage for all regular Employees covered by this Agreement has been established, which is to be provided without Employee or retiree contributions . . . .  During the term of this Agreement there shall be no reduction in the schedule of benefits."  116 F.3d at 981.  The plaintiffs argued that the language stating that the benefits would "be provided without employee or retiree contributions" constituted an enforceable promise despite acknowledging the fact that the CBA promised on its face that there would be no reductions during the life of the agreement.  In short, the plaintiffs took a position quite similar to the Retiree Plaintiffs' position here: "that after the CBAs expired, Multifoods was free to reduce of even eliminate the retirees' medical benefits, but that if Multifoods offered any retiree medical insurance, the retirees could not be required to pay part of the premiums to receive that insurance."  *Id.*  The Second Circuit rejected this argument: "Because the CBAs do not require Multifoods to provide that retirees with any medical benefits once the CBAs have expired, any benefits provided are purely gratuitous.  It is well established that the beneficiary of a gift, if accepted, cannot object to the form of the gift."  *Id.*

In *International Mutlifood Corp.*, the Second Circuit also considered the implications of an SPD sent to retired employees. Under the heading "NO COST TO YOU," the SPD "state[d] that '[t]he entire cost of the coverage is paid by Multifoods.'  Further, later in the document, the SPD state[d] 'PLAN COSTS—Paid by Employer.'"  *Id.* at 982.  Again, the Second Circuit declined to find any binding promise on the part of Multifoods, noting that "these statements simply indicate *who* would pay the costs of the plan at the time the SPD was published; these

statements in no way indicate that Multifoods would *continue* to pay the cost of the plan for the

retirees' lifetimes.  A promise to pay present costs is obviously quite different than a promise to

pay costs indefinitely."  *Id*. (emphasis in original).

Here too, the language of Section 4(e)(2), at most, indicates "who" must pay certain

benefits, but lacks any language suggesting that benefits would be available to retirees over their

lifetime.  Absent any language affirmatively promising retired employees lifetime benefits,

Retiree Plaintiffs "cannot object to the form" of any benefits granted to retired employees might

take.

In short, the Court rejects Retiree Plaintiffs' contention that Section 4(e) affirmatively

promised retired employees welfare benefits without contribution.  Because this is the sole

language which arguably created a promise of benefits, Retiree Plaintiff's class claims fail as a

matter of law.  Accordingly, the class portion of Claim Two is dismissed.[5]

---

[5] The import of the SPDs is hotly disputed in this case, and because the Court has found that no
affirmative promise of benefits exists in the Trust Agreement, it need not reach the question
whether any affirmative promise could be counteracted by language in the plan descriptions sent
to employees.  It is nonetheless worth noting that the 1978 SPD—which was in effect at the time
the 1982 Trust Agreement was created— informed participants that "[t]he Trustees reserve the
right to amend, modify or discontinue all or part of this plan whenever, in their judgment,
conditions so warrant."  (Stip., Ex. 25 at 65).  Elsewhere, the 1978 SPD is even more explicit that
all benefits, including those for retired participants, are not guaranteed:

> Plan benefits for active, retired or disabled participants are not
> guaranteed.  The trustees reserve the right to change or discontinue
> (1) the types and amounts of benefits under this plan and (2) the
> eligibility rules, including those rules providing extended or
> accumulated eligibility even if the extended eligibility has already
> been accumulated.

(*Id*., last page (unnumbered).)  Later iterations of the SPD contain substantially similar language.
(Stip., Ex. 22 at 109 ("The Board of Trustees intends to continue the Welfare Fund indefinitely;
however, it reserves the exclusive right to amend, modify, suspend, increase the cost or terminate
the plan at any time, in accordance with the procedures specified in the Trust agreement."); Stip.,
Ex. 23 at v-vi (reserving the right to amend or terminate benefits); Stip., Ex. 24, last page

### 2.    The Anti-Cutback Claim

Claim Three, brought under Section 204(g) of ERISA, also fails as a matter of law,

because Section 204(g) does not apply to welfare plans.

ERISA Section 204(g), the so-called anti-cutback provision, provides as follows:

> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 302(c)(8) or 4281 [29 USC § 1082(c)(8) or 1441].

> (2) For purposes of paragraph (1), a plan amendment which has the effect of-

> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), . . .

> with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

29 U.S.C. § 1054(g).  It is beyond dispute that Section 204(g) is applicable only to pension plans,

and not to welfare plans.  *See* 29 U.S.C. § 1051(1) ("This part shall apply to any employee

benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of

this title) other than – an employee welfare benefit plan"); *see also Robinson*, 515 F.3d at 98.

Retiree Plaintiffs nonetheless argue that the anti-cutback rules apply to the instant case.  In

support of this proposition, Retiree Plaintiffs point to the 2004 SPD, which provides that, in

---

(unnumbered) (same).)  *Accord Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A*, 515 F.3d 93, 99 (2d Cir. 2008) ("We see no ambiguity in a summary plan description that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change." (quoting *Sprague*, 133 F.3d at 401).  *But see Berg v. Empire Blue Cross & Blue Shield*, 105 F. Supp. 2d 121, 127-29 (E.D.N.Y. 2000) (noting that, in the Second Circuit, a general reservation of rights in an SPD does not supersede language affirmatively promising benefits and should not be taken into account (citing *Joyce*, 171 F.3d at 136)); *Cigna Corp. v. Amaro*, 131 S.Ct. 1866, 1878 (2011) ("[C]onclud[ing] that [SPDs], important as they are . . . do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B).").

order to be eligible for Health or Welfare coverage, a retiree must satisfy one of the following requirements:

> You have earned at least 30 Vesting Credits with the New York City District Council of Carpenters Pension Fund (the "Pension Fund").  In general, you earn one Vesting Credit for each calendar year in which you work 870 hours or more in Covered Employment;
>
> You have earned at least 15 Vesting Credits under the Pension Fund and, during the 60-month period immediately preceding the effective date of your pension, you are eligible as an Active Employee for at least 24 months . . . .

According to Retiree Plaintiffs, "by linking retiree health benefits to pension benefits [,] the retiree health benefits become part of the benefits conferred by the Pension Plan and therefore irreducible once vested."  (Pls.' Opp'n at 27-28.)

Retiree Plaintiffs' argument that the above-quoted language from the 2004 SPD essentially transforms Welfare Plan benefits into Pension Plan benefits is unpersuasive.  First, Section 204(g) is intended to protect employees' pension benefits; here, while the Welfare Plan benefits were contingent upon Pension Plan benefits, the alteration of the Welfare Plan did not in any way disturb the benefits promised by the Pension Plan.  Second, nothing in the statutory language suggests that where employees' entitlement to welfare benefits is linked to their entitlement to pension benefits, welfare benefits – administered in a separate welfare plan – are therefore governed by Section 204(g).  Indeed, under ERISA, a plan constitutes a "welfare plan" only if it provides welfare benefits, and a plan is a pension plan only if it provides pension benefits.  *See* 29 U.S.C. § 1002(1) (a fund is a welfare plan "to the extent" that it "was established is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or

vacation benefits . . . .); § 1002(2)(A)(i) (a fund is a pension plan "to the extent" that it provides retirement income to employees); *accord Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 193 (2d Cir. 2000) (holding that a disability plan constitutes welfare plan despite the fact that the employer called the plan a "pension benefit" as the underlying benefits are welfare benefits pursuant to § 1002(1)).  Thus, a welfare plan cannot simply become part of a pension plan because the plan administrator links the distribution of welfare and pension plan benefits.  Nor have Retiree Plaintiffs cited a single case suggesting a rule to the contrary.[6]

Accordingly, Retiree Plaintiffs' anti-cutback claim fails as a matter of law.

### 3.     The Improper Modification Claims

In Claim Four, Retiree Plaintiffs allege that Defendants failed, in several respects, to properly amend the 2004 Trust Agreement.  Retiree Plaintiffs' arguments on this front are also unpersuasive.

### a.     Notice of Amendment Claim

Retiree Plaintiffs first allege that Defendants violated ERISA by failing to notify the Welfare Plan participants in a timely fashion of material modifications stemming from the July 1, 2004 amendments to the Trust Agreement.  ERISA requires that "[a] summary of any material modification in the terms of the plan . . . shall be furnished in accordance with section 1024(b)(1) of this title."  29 U.S.C. § 1022(a).  Section 1024(b)(1)(B) provides that the summary of the material modification be furnished "not later than 210 days after the end of the plan year in

---

[6] In support of their argument, Retiree Plaintiffs point to two unpublished decisions by federal district courts in Ohio: *Tackett v. M&G Polymers USA, LLC*, No. 07 Civ. 126, 2011 WL 1114281 (S.D. Ohio Mar. 24, 2011), and *White v. Beacon Journal Publ'g Co.*, 09 Civ. 2193, 2010 WL 1948290 (N.D. Ohio May 13, 2010).  Neither case suggests that Section 204(g) should in certain instances apply to welfare benefits.

which the change is adopted." 29 U.S.C. § 1024(b)(1).[7]  While ERISA does not define the term

"material modification," "[c]ourts have recognized that Congress, in enacting ERISA's notice

provisions, was primarily concerned with whether the plan participants had adequate notice of

qualification or disqualification provisions concerning benefits."  *Ward v. Maloney*, 386 F. Supp.

2d 607, 612 (M.D.N.C. 2005).  Thus, "not all amendments are material modifications, for

Congress could not have envisioned a scheme by which plan administrators were required to

notify participants every time a word or phrase was altered in an ERISA plan. Where an

amendment merely clarifies the language in the Plan and does not effect substantive changes, the

amendment is not a material modification."  *Id.* (citing cases); *see also Hasty v. Central States,*

*Southeast and Southwest Areas Health and Welfare Fund,* 851 F.Supp. 1250, 1256 (N.D. Ind.

1994) (no material modification where the amendments merely "clarify a power" that the

trustees already have).  As explained above, the amendments made to the Trust Agreement did

not modify the benefits available to Plan participants.  Rather, those modifications occurred in

2012, at the command of the Arbitrator.  Because the 2004 Trust Agreement does not constitute a

material modification of employee benefits, Retiree Plaintiff's claim must fail.[8]

### b.      Plan Amendment Procedures Claim

Claim Four also alleges that Defendants failed to amend the Trust in conformance with

the 1982 Trust Agreement.  ERISA requires that "[e]very employee benefit plan shall . . .

provide a procedure for amending such plan." 29 U.S.C. § 1102(b)(3). "[T]his requirement is not

---

[7]Similarly, Section 2715(d)(4) of the Public Service Health Act ("PSHA") provides that if a group health plan or health insurance issuer makes any material modification in any of the terms of the plan or coverage involved (as defined for by section 102 of ERISA) that is not reflected in the most recently provided summary of benefits and coverage, the plan or issuer must provide notice of such modification to enrollees not later than 60 days prior to the date on which such modification will become effective.

[8] Defendants have also demonstrated that, when employees' benefits were modified in 2012, the Trustees complied with their statutory obligation to inform the employees in a timely matter.

onerous." *Int'l Multifoods Corp.*, 116 F.3d at 984 (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80 (1995)). ERISA "dictat[es] only that whatever level of specificity a company ultimately chooses, . . . it is bound to that level." *Schoonejongen*, 514 U.S. at 85.

Section 15 of the 1982 Trust Agreement provides:

> The Trustees may amend this Agreement and Declaration of Trust from time to time provided that such amendments are in writing and *comply with the purposes hereof*. . . . [A]ll amendments [] shall be filed by the Trustees and made part of their records and minutes and a copy of each amendment shall be *sent to the Union and to the employers*. All amendments shall become effective by resolution of the Trustees provided that a copy of the amendment is mailed by Registered Mail to the representatives of *all parties to this Agreement and Declaration of Trust*, and provided that no written objection is received by the Fund Director at the office of the Trustees from any of the parties within forty-five days after said mailing . . . .

(emphasis added.) Retiree Plaintiffs make several arguments as to how Defendants failed to comply with Section 15. First, they argue that the July 1, 2004 amendment "does not comply with the purposes of the Trust which is to provide free health care to eligible retirees who retired under the pension plan." (Compl. at ¶ 51.) For the reasons explained *supra*, the Court rejects the contention that a "purpose of the Trust" is to provide "free health care" to retirees. Second, Retiree Plaintiffs argue that "[t]he Trustees failed to meet the procedural notice requires of" Section 15. (*Id.*) This claim is also without merit. Retiree Plaintiffs have proffered no evidence suggesting that the Trustees failed to provide written notice by registered mail of the 2004 Trust Agreement to the District Council and the employers, as required by Section 15 of the 1982 Trust Agreement.

### D.      The Non-Class Claims

#### 1.      Prohibited Transaction

"Responding to deficiencies in prior law regulating transactions by plan fiduciaries," Congress enacted Section 406(a) of ERISA," so as to "categorically bar[] certain transactions deemed likely to injury the pension plan."  *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (internal quotation marks and citations omitted).   Section 406(a)(1)(D) of ERISA provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . ."  29 U.S.C. § 1106(a)(1)(D).  ERISA defines "party in interest" to include, *inter alia*, "an employee organization any of whose members are covered by such plan."  29 U.S.C. § 1002(14)(D).  "The transactions enumerated in § 406(a)(1) are per se violations of ERISA regardless of the motivations which initiated the transaction, the prudence of the transaction, or the absence of any harm resulting from the transaction."  *Liss v. Smith*, 991 F. Supp. 278, 307 n.30 (S.D.N.Y. 1998) (quoting *Reich v. Polera Bldg. Corp.*, No. 95 Civ. 3205, 1996 WL 67172, at *2 (S.D.N.Y. Feb. 15, 1996)).  This *per se* bar on certain transactions between an ERISA plan and a party of interest is subject to various statutory and regulatory exemptions.  *Harris Trust*, 530 U.S. at 242.

### a.    Applicability of Third Party Payment Exemption[9]

Pursuant to Section 408(a) of ERISA, the Department of Labor ("DOL") is expressly

granted the authority to promulgate exemptions to Section 406, 29 U.S.C. § 1108(a).  29 C.F.R. §

2509.78-1 ("I.B. 78-1") outlines one such exemption.  I.B. 78-1 provides that an arrangement

whereby "a payment by multiple employer vacation plans of a sum of money to which a

participant of beneficiary of the plan is entitled to a party other than the participant or

beneficiary" does not violate ERISA's prohibited transaction provision if:

> (1) The plan documents expressly state that benefits payable under
> the plan to a participant or beneficiary may, at the direction of the
> participant or beneficiary, be paid to a third party rather than to the
> participant or beneficiary;
>
> (2) The participant or beneficiary directs in writing that the plan
> trustee(s) shall pay a named third party all or a specified portion of
> the sum of money which would otherwise be paid under the plan to
> him or her; and
>
> (3) A payment is made to a third party only when or after the
> money would otherwise be payable to the plan participant or
> beneficiary.

Additionally, the arrangement must comply with the conditions set forth in Prohibited

Transaction Exemptions 76-1 and 77-10:

> These conditions are: (a) the plan receives reasonable
> compensation for the provision of the services (for purposes of the
> exemption, "reasonable compensation" need not include a profit
> which would ordinarily have been received in an arm's length

---

[9] The District Council argues that, as a threshold matter, "[s]ince the dues monies were not plan assets, Plaintiffs state no claim under ERISA § 406(a) . . . ."  (D.C. Mem. at 9 n.3.)  But Defendant-Intervenor's primary authority for this assertion, a 1975 DOL Opinion on the propriety of a scheme similar to the Blue Card system, contravenes the notion that the forwarding of vacation funds to a union to pay working dues fall outside the scope of Section 406(a) of ERISA.  *See* Office of Pension and Welfare Benefits Program, U.S. Dep't of Labor, Op. No. 75-95, 1975 WL 4589, at *1 (Dec. 17, 1975) ("The plan [,] by collecting [] dues on behalf of the union and by transmitting such dues to the union, is providing a service to the union, *which falls within the scope of section 406(a)(1)(c)*."  (emphasis added)).

> transaction, but must be sufficient to reimburse the plan for its
> costs); (b) the arrangement allows any multiple employer plan
> which is a party to the transaction to terminate the relationship on a
> reasonably short notice under the circumstances; and (c) the plan
> complies with certain recordkeeping requirements.

*Id.* (citing Prohibited Transaction Exemptions 76-1, Part C, (41 Fed. Reg. 12740, March 26,

1976) and 77-10 (42 Fed. Reg. 33918, July 1, 1977)).  More specifically, Prohibited Transaction

Exemption 76-1 contains the following recordkeeping requirements:

> (d) The plan . . . which provides such administrative services or
> goods [must] maintain[] or cause to be maintained during the
> period . . . of such provision of services . . . for a period of six
> years from the date of termination of services . . . such records as
> are reasonably necessary to enable the persons described in
> paragraph (e) of this section to determine whether the conditions of
> this exemption have been met, except that (1) a prohibited
> transaction will not be deemed to have occurred if, due to
> circumstances beyond the control of the plan fiduciaries, such
> records are lost or destroyed prior to the end of such six-year
> period . . . .
>
> (e) . . . [T]he records referred to in paragraph (d) [must be]
> unconditionally available at their customary location for
> examination during normal business hours by duly authorized
> employees of . . .  (4) any employer of plan participants and
> beneficiaries . . . .

 41 Fed. Reg. 12745.

    If the fiduciary fails to comply with even one condition of the exemption, it does not

apply, and the transaction is a *per se* breach of her fiduciary duty.  *See Marshall v. Davis*, 517 F.

Supp. 551, 553 (W.D. Mich. 1981) (the sending of dues to a union is not granted the protection

of IB 78-1 where union dues were deducted on a monthly basis and funds were distributed to

participants on an annual basis, dispute the fact that the other criteria for the exemption were

met); *cf.* 41 Fed. Reg. 12741 (noting that Prohibited Transaction Exemption 76-1 "is applicable

to a particular transaction only if the transaction satisfies the conditions specified . . . .); *cf. Reich*

*v. Hall Holding Co.*, 990 F. Supp. 955, 967 (N.D. Ohio 1998) (because "the purpose of § 406 is to alleviate the danger of self-dealing in transactions between a plan and its sponsor," the exemptions carved out by Section 408 should be construed "narrowly").

Plaintiffs argue that this exemption cannot apply for several reasons, chiefly because the Welfare Plan did not receive reasonable compensation for its services as is required by Prohibited Transaction Exemption 76-1, and that, even if the compensation was reasonable, the exemption cannot apply because the compensation was paid *after* the use of the Blue Card system.  Plaintiffs also argue that, because the District Council did not receive compensation during the Welfare Fund's provision of services, it could not have complied with the recordkeeping provisions of Exemption 76-1.[10]  By contrast, Defendants and Defendant-Intervenor argue that Plaintiffs' contention that "because the administrative expenses of the Blue Card system were not paid and recorded contemporaneously, [Defendants] cannot benefit from the exemption to ERISA 406 . . . elevates form over substance."  (D.C. Rep. at 5.)

The Court agrees with Plaintiffs that Defendants cannot benefit from the above-described exemption to ERISA's prohibited transaction rule.  It is undisputed that the Welfare Fund did not receive any compensation for its services during the six years in which the Blue Card system was in existence, and the Trustees therefore simply cannot meet the above-outlined exemption to the

---

[10] There is arguably a genuine dispute of material fact as to whether the Plan made payments to the District Council more frequently than to the plan participants, in violation of Section 2509.78-1's third criterion.  Plaintiffs note that the S&P Report suggests that working dues were distributed monthly, while vacation benefits were distributed to Welfare Fund participants monthly.  (Dkt. No. 57 ("Panettieri Decl., Ex. A ("S&P Rep.") at 1.)  In his Supplemental Declaration, David Jacobsen avers, quite convincingly, that in fact fees were never paid to the District Council before vacation benefits were paid to employees.  (*See* Dkt. No. 54.)  In any event, the Court need not reach the question whether a genuine dispute of material fact exists as to whether payments to the District Council were ever made before payments to the District Council, as, for the reasons explained *infra*, the Blue Card system as administered here constituted a *per se* violation of the prohibited transaction rule.

prohibited transaction rule.  In short, irrespective of the District Council's payment to the

Welfare Fund *after* the transaction took place, by declining to seek reasonable compensation for

the Blue Card system during the six years it was in place, the Trustees unquestionably

"transfer[red] to . . . a party in interest . . . assets of the plan," 29 U.S.C. 1106(1)(D), thereby

breaching their fiduciary duty to the Welfare Plan.  Defendants and Defendant-Intervenor argue

that the District Council's *post facto* payment should retroactively garner Defendants the

protection of the exemption, but neither logic, nor the relevant case law, suggests that a *per se*

prohibited transaction can be retroactively cured.  *See Westoak Realty and Inv. Co., Inc. v. C.I.R.*,

999 F.2d 308, 310 (8th Cir. 1993) (holding, in a case concerning 26 U.S.C. § 4975, the parallel

tax provision to Section 406, that "[t]he legislative history of ERISA as well as the structure of §

4975 reflect Congress' intent that the prohibited transactions under § 4975 are per se violations,

and not curable retroactively"); *cf. Gray v. Briggs*, 45 F. Supp. 2d 316, 326 (S.D.N.Y 1999)

(noting that a prohibited transaction is a *per se* violation of ERISA's fiduciary duty rules,

"regardless of the . . . the absence of any harm arising from the transaction" (internal citation and

quotations omitted)); 2 Ronald J. Cooke, *ERISA Practice and Procedure* § 6:13 (2012) (same).

  Defendants also point to no evidence that, while the Blue Card system was in place, the

Trustees ever considered requesting – or that the District Council ever considered offering –

reasonable compensation for the Welfare Fund's administration of the system.  Thus, apart from

the Blue Card system violating section 406(a), it is difficult to see how the system could be

construed as being carried out "solely in the interest of the participants and beneficiaries," as

ERISA requires.  29 U.S.C. § 1104(a)(1).  In any event, even if the plan participants gained some

benefit from the Blue Card system, ERISA's prohibited transaction rule does not, outside the

DOL's exemption, permit Trustees to "'balance the interests' involved by facilitating a Union

dues assessment program and by managing in a financially responsible way the Vacation and

Holiday Fund for the benefit of participants."   *Marshall*, 517 F. Supp. at 553.

Relatedly, because the Welfare Fund received no compensation for its services during the

six years the Blue Card system was in use – or, more specifically, because no agreement to

compensate the Welfare Fund appears to have been in place during the Blue Card system's

existence – Defendants cannot possibly demonstrate that "*during the period* . . . of such

provision of services," the Welfare Fund maintained records "reasonably necessary to enable"

Welfare Plan participants "to determine whether the conditions of this exemption have been

met."  Any employee who attempted to access the billing records related to the Blue Card system

would have found that so such records existed, as no billing was taking place.  This constitutes

an additional reason for concluding that I.B. 78-1 is inapplicable to the transaction between the

Welfare Fund and the District Council.

Accordingly, Defendants have committed a *per se* violation of section 406(a)(1)(D) of

ERISA.[11]

### b.    Relief

As a result of the *per se* violation, Plaintiffs may seek damages from the Welfare

Plan's fiduciaries pursuant to Section 409(a) of ERISA, which provides in part:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make
> good to such plan any losses to the plan resulting from each such
> breach . . . and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate . . . .

---

[11] Plaintiffs have consented to the dismissal of Claims Five, Six, and Eight in the event that this
Court determines that Defendants violated ERISA section 406(a) as a matter of law. (Pls.' Rep.
at 3 n.2.)  Because the Court has indeed determined that Plaintiffs violated ERISA's prohibited
transaction rule, the Court dismisses the remaining non-class claims.

29 USC § 1109(a).  Although Section 409(a) only contemplates a remedy against plan

fiduciaries, the Supreme Court has squarely held that plaintiffs may seek "appropriate equitable

relief" under Section 502 (a)(3) of ERISA, 29 USC § 1132(a)(3), from a nonfiduciary transferee

for its participation in a prohibited transaction.  Where there is a prohibited transaction barred by

Section 406(a), a non-fiduciary may be liable under Section 502(a)(3) "if it would be a proper

defendant under 'the common law of trusts,' for example, when it is 'a transferee of ill-gotten

trust assets . . . , and then only when the transferee . . . knew or should have known of the

existence of the trust and the circumstances that rendered the transfer in breach of the trust.'"

*Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 308 (2d Cir. 2003) (quoting *Harris Trust*, 530 U.S.

at 250-51).[12]

      The "appropriate remedy in cases of breach of fiduciary breach is the restoration of the

trust beneficiaries to the position they would have occupied but for the breach of trust."

*Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).  If that amount is less than the

damages from this violation, Defendants must pay the difference between the two.  By contrast,

if the amount already paid by the District Council is greater than or equal to the damages arising

from this violation, then no further relief is available to Plaintiffs.  *See N.Y. State Teamsters*

---

[12] Defendant-Intervenor argues that Section 502(a)(3) provides no appropriate remedy against
the District Council in this case.  The Court disagrees.  Here, the District Council was the
recipient of the Welfare Fund's unpaid-for services, in breach of the Welfare Fund's fiduciary
duty under ERISA, and is therefore potentially liable in restitution.  *See* Restatement (Third) of
Restitution & Unjust Enrichment § 17 (2011) ("A transfer by an agent, trustee, or other fiduciary
outside the scope of the transferor's authority, or otherwise in breach of the transferor's duty to
the principal or beneficiary, is subject to rescission and restitution.  The transferee is liable in
restitution to the principal or beneficiary as necessary to avoid unjust enrichment.").  An unjustly
enriched party can be held liable for the reasonable value of the services rendered.  *See e.g.
Peninsular & Oriental Steam Nav. Co. v. Overseas Oil Carriers, Inc.*, 553 F.2d 830 (2d Cir.
1977) (holding the owner of a vessel liable in restitution for the reasonable value of services
rendered by another vessel which came to the aid of a sick crewmember).

*Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir. 1994) (requiring defendant to show that maintenance workers hired in a prohibited transaction provided value at least equal to the amount they were paid or else pay the difference between that value and what they were paid); *see also Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997) (under the "'no harm, no foul' rule, . . . even if the defendants did breach the fiduciary duties they owed to the plaintiffs, in violation of ERISA, the [plaintiffs] are not entitled to recovery of damages for that breach absent proof of an actual economic loss").

Defendants and Defendant-Intervenor argue that the amount already paid by the District Council to the Welfare Fund is greater than or equal to the value of any damages arising from this violation. This payment was made pursuant to a report prepared by S&P ("the S&P Report"). (*See* S&P Rep.) In essence, the S&P Report examined the time spent by employees in fiscal year 2011 on processing working dues assessments and related issues. It then used the 2011 expenses as the basis for estimating allocable expenses in other years as well. Plaintiffs raise several objections to the Report, including that it inappropriately excluded certain expenses from the allocation; that it should have examined actual expenses in every year at issue; that it should have used accrual rather than cash accounting; and that a different interest rate should have been used in the calculation. Defendants respond by arguing that its costs were consistent across the six-year period, so that using fiscal 2011 as a proxy for all years' expenses was appropriate and justified to avoid incurring unnecessary costs.[13] Similarly they argue that adjusting their accounts from a cash- to accrual-basis would have "unnecessarily increased the cost of the study" and "would not have had a significant impact on the findings." (Panettieri

_____

[13] While Mr. Panettieri is surely right that determining the cost of the Blue Card system for each of the six years would have increased the cost of the S&P Report, it is worth noting that this problem could have been avoided if the Trustees had maintained records of the administrative costs, as they were required to do pursuant to I.B. 78-1.

Decl. at ¶ 36.)  They also dispute Plaintiffs' contention that any expenses were inappropriately excluded from the study.  Further, they argue that the interest rate chosen was more than reasonable.

Defendants contend that the S&P's report's calculation is eminently reasonable and that because Plaintiffs have raised no genuine issue of material fact showing it to be unreasonable, they are entitled to summary judgment.  If the existence of the violation were based on the reasonableness of contemporaneous payments otherwise falling within the exemption, this argument might be more persuasive, as Prohibited Transaction Exemption 76-1 seems to provide welfare plans with some discretion in determining what constitutes "reasonable compensation." *See* 41 Fed. Reg. 12745.  Here, however, a violation has already been established and Defendants are not entitled to assert that their calculation is the default objective measure of damages, even if it were considered to be within a range of reasonable possibilities of the value of services provided.  The question is not whether the S&P report calculation is a reasonable one, but rather whether an objective level of damages might exceed that amount.  Plaintiffs' objections to the S&P report are sufficient to raise genuine issues of material fact as to whether the appropriate amount of damages might be higher than Defendant's calculation.  (*See generally* Dkt. No. 68 ("Cheek Decl.".)[14]  The Court will therefore conduct further proceedings to consider the question of amount of damages, if any.[15]

---

[14] Counsel for Plaintiffs initially purported to dispute the reasonableness of the S&P report with an unsworn letter from accountant John T. Cheek.  (Dkt. No. 48, Ex. 6.)  After Defendants and Defendant-Intervenor called into question the admissibility of such an unsworn statement, Plaintiffs submitted a sworn declaration by Mr. Cheek.  Together, the Cheek Declaration and Cheek Letter suggest that the costs of administering the Blue Card system might have been significantly higher than the $1.7 million paid by the Union to the Welfare Fund.

**III.     Conclusion**

For the foregoing reasons, Defendants' cross-motion for summary judgment is GRANTED, Defendants' motion for summary judgment and Defendant-Intervenor's motion for summary judgment are GRANTED in part and DENIED in part, and Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part.  Claims One, Two, Three, Four, Five, Six and Eight are dismissed.  By contrast, Defendants are liable under Claim Seven as a matter of law.  In sum, the sole remaining issue in this case is the appropriate remedy for Claim Seven.

The Clerk of the Court is directed to terminate the motions at Docket Numbers 20, 33, 36, and 37.

The parties are directed to meet and confer, and, on or before July 22, 2013, to jointly propose a schedule for resolution of the remaining issue in this case.

SO ORDERED.

Dated: New York, New York
        July 1, 2013

_____
          J. PAUL OETKEN
     United States District Judge

---

[15]Plaintiffs have also moved for attorney's fees pursuant to 29 U.S.C. § 1132(g)(1).  The Court has concluded that it would be premature to address the issue of attorney's fees at this juncture. Plaintiffs may raise the matter again during the next stage of the litigation.